MAISLIN INDUSTRIES and U.S.
Inc., Appellants,

v.

PRIMARY STEEL, INC., Appellee.

No. 88–2267.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 11, 1989.
Decided July 17, 1989.

Thomas M. Auchincloss, Jr., Washington, D.C., for appellants.

Charles J. Streiff, Pittsburgh, Pa., and Judith Albert, ICC, Washington, D.C., for appellee.

Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and BRIGHT, Senior Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

This case presents the issue of whether the "filed rate doctrine," which requires a motor carrier to collect the rate published in a filed tariff, obliges Primary Steel, Inc. to pay Maislin Industries and U.S., Inc. an amount greater than that which the parties negotiated. The district court affirmed a ruling of the Interstate Commerce Commission finding it unreasonable under 49 U.S.C. § 10701 for Maislin to recover tariff charges higher than those agreed to by the parties. *Maislin Indus. v. Primary Steel*, 705 F.Supp. 1401 (W.D.Mo.1988). On appeal, Maislin challenges the district court's referral of the issue to the ICC, its subsequent affirmance of the ICC decision, and its denial of prejudgment interest. We affirm the judgment of the district court.[1]

Maislin brought this action against Primary Steel to recover freight tariff charges in the amount of $187,923.36. Quinn Freight Liners, Inc., a division of Maislin, made 1,081 shipments of steel for Primary Steel over a three year period. Pursuant to 49 U.S.C. § 10761 (1982), Maislin had filed tariffs with the ICC containing rates and charges applicable to the transportation services provided for Primary Steel. Primary Steel and Maislin, however, had negotiated a shipment rate for an amount below the filed tariff rate, with the understanding that Maislin would file the lower negotiated rate with the ICC. Maislin never filed this negotiated rate with the ICC.

Maislin and its divisions later initiated Chapter 11 bankruptcy proceedings, and the alleged undercharges were discovered by an audit agency appointed by the bankruptcy court. The claimed undercharges of $187,923.36 represent the difference between the negotiated rates paid by Primary Steel and the tariff rate filed by Maislin with the ICC.

---

1. The Honorable John W. Oliver, Senior United States District Judge for the Western District of Missouri.

The district court relied on the doctrine of "primary jurisdiction," referring to the ICC the questions of whether Maislin's freight rates and charges were unreasonable and whether Maislin's practice of assessing and rebilling Primary Steel for tariff rates higher than those originally negotiated by the parties constituted an unreasonable practice in violation of 49 U.S.C. § 10701(a).

The ICC relied upon its earlier decision in *National Indus. Transp. League—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates, Ex Parte No. MC–177*, 3 I.C.C.2d 99 (1986) (hereafter *Negotiated Rates*), and held that it could inquire into whether the imposition of undercharges would be an unreasonable practice under 49 U.S.C. § 10701(a).[2] Making extensive factual findings, the ICC determined that Maislin had quoted a rate other than a tariff rate to Primary Steel, that an agreement had been reached between the parties, and that Primary Steel had, in fact, reasonably relied on the rate quotation. The ICC concluded that Maislin would commit an unreasonable practice in requiring Primary Steel to pay undercharges for the difference between the negotiated rates and the tariff rates.

Both parties moved before the district court for summary judgment, Primary Steel relying on the ICC decision, and Maislin contending that the ICC decision was not binding, but only an advisory opinion, and that its decision was contrary to law. The district court found that the ICC decision resolved a question within its primary jurisdiction because the issue presented required an inquiry into the lawfulness of a carrier's practice, and that it was appropriate to defer to the special expertise and administrative discretion of the ICC. *See Iowa Beef Processors, Inc. v. Illinois*

*Centr. Gulf R.R. Co.*, 685 F.2d 255, 259 (8th Cir.1982). The district court concluded that the ICC decision, therefore, should be accorded substantial deference, and not be set aside unless it exceeded the ICC's statutory authority or was unsupported by substantial evidence. *See Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–21, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966).

The district court recognized that in the past courts have not permitted deviation from the filed rate required under 49 U.S.C. § 10761. *See, e.g., Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). Further, the ICC has also refused to allow the waiver of undercharges based on ignorance or carrier misquotations. The district court, however, rejected the applicability of the filed rate doctrine, relying on the 1986 ICC policy change announced in *Negotiated Rates*. 3 I.C.C.2d 99. *Negotiated Rates* allows the ICC, upon a court's request, to determine whether collection of undercharges would constitute an unreasonable practice under 49 U.S.C. § 10701. The district court observed that the ICC had not abolished the section 10761 requirement that mandates carriers to charge the tariff rate. Rather, it changed its policy on enforcing the "unreasonable practice" provision of section 10701(a), by allowing the consideration of equitable defenses. The court held that nothing prohibits the ICC from changing its policy and that this change in policy was justified and consistent with its practices under the Interstate Commerce Act. Finally, the district court concluded that the ICC's determination, that a negotiated rate existed and that collection of the alleged undercharge would be an unreasonable and unlawful practice, was supported by substantial evidence.

---

**2.** 49 U.S.C. § 10701(a) (1982) provides:

A rate (other than a rail rate), classification, rule, or practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission * * * must be reasonable.

49 U.S.C. 10704(a)(1) (1982) further provides:

When the Interstate Commerce Commission, after a full hearing, decides that a rate

charged or collected by a carrier for transportation * * * or that a classification, rule, or practice of that carrier, does or will violate this subtitle, the Commission may prescribe the rate (including a maximum or minimum rate, or both), classification, rule, or practice to be followed. The Commission may order the carrier to stop the violation.

Summary judgment was accordingly granted in favor of Primary Steel.

## I.

■ Maislin first argues that the issue before the district court was not within the ICC's primary jurisdiction. The issue before the ICC here was whether Maislin's practice of assessing and rebilling Primary Steel for the filed tariff rate, which is higher than the rate negotiated and paid by Primary Steel, constituted an unreasonable practice in violation of 49 U.S.C. § 10701(a). Maislin contends that this issue is a question of law and within the competence of the judiciary. In its Order of Referral, the district court, citing *Iowa Beef Processors,* 685 F.2d at 259, held that the doctrine of primary jurisdiction required it to refer the matter to the ICC, as "the claim presented to the court requires an inquiry into the lawfulness of a carrier's practice." The court concluded that this "policy decision should be dealt with uniformly and with reference to the underlying reasons and policies for the regulations," and that it is therefore "appropriate that we defer to the special expertise, competence, and administrative discretion possessed by the ICC." In its order granting Primary Steel's motion for summary judgment, the district court rejected Maislin's contention that it improperly referred the issue to the ICC.

■ We are satisfied that the reasonableness of Maislin's billing practices is a matter properly within the ICC's primary jurisdiction. The Supreme Court in *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 65, 77 S.Ct. 161, 165–66, 1 L.Ed.2d 126 (1956), held that the ICC has primary jurisdiction over any matter that "raises issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by that Act." Further, the doctrine of primary jurisdiction should be exercised if the issues in the proceeding "turn on a determination of the reasonableness of a challenged practice," or raise a "question of the validity of a rate or practice." *Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 304–06, 96 S.Ct. 1978, 1987–88, 48 L.Ed.2d 643 (1976). In *Iowa Beef Processors,* 685 F.2d 255, we held that the doctrine of primary jurisdiction dictated that the ICC determine, in the first instance, whether a practice provided for in a carrier's tariff is reasonable. *See also General Am. Tank Car Corp. v. El Dorado Terminal Co.,* 308 U.S. 422, 431–32, 60 S.Ct. 325, 330–31, 84 L.Ed. 361 (1940); *Western Transp. Co. v. Wilson & Co.,* 682 F.2d 1227, 1231 (7th Cir.1982).

The Eighth Circuit has not specifically addressed the application of the primary jurisdiction doctrine in a case involving an allegation of unreasonable collection of undercharges. This issue, however, was addressed by the Eleventh Circuit in *Seaboard System R.R. Co. v. United States,* 794 F.2d 635, 638 (11th Cir.1986), where the court held that "finding a carrier practice unreasonable is the kind of determination that lies in the primary jurisdiction of the Commission." Likewise, a majority of the lower federal courts presented with similar claims for undercharges have referred the issue to the ICC. *See, e.g., Delta Traffic Serv. Inc. v. Marine Lumber Co.,* 683 F.Supp. 754 (D.Or.1987); *Motor Carrier Audit & Collection Co. v. Family Dollar Stores, Inc.,* 670 F.Supp. 644 (W.D.N.C. 1987); *In re Tucker Freight Lines, Inc.,* 85 B.R. 426 (W.D.Mich.1988).[3]

The decision of whether to allow Maislin to collect undercharges directly involves the reasonableness of Maislin's billing practices. This determination requires the con-

---

**3.** In *Negotiated Rates,* the ICC addressed the scope of its primary jurisdiction:

[T]he Commission lacks initial jurisdiction to entertain challenges to the reasonableness of motor carrier rates charged in the past, or to order the waiver of undercharges. However, this does not mean that we lack authority to address the question of what rate should have been charged by a carrier (the tariff rate, the negotiated rate or some other rate) if the carrier brings an action for undercharges in district court, 49 U.S.C. §§ 10705(b)(3), 11706, and the court refers the question of whether the collection of undercharges would be an unreasonable practice to us under the doctrine of primary jurisdiction.

3 I.C.C.2d at 106–07.

sideration of the facts and circumstances regarding both the existence of the alleged negotiated rate and the reasonableness of allowing Maislin to collect the undercharges. Such matters involve the special expertise of the ICC. We affirm the district court's holding that the ICC had primary jurisdiction to determine the reasonableness of Maislin's billing practices.

## II.

The central argument asserted by Maislin is that the filed rate doctrine bars consideration of equitable defenses. Maislin argues that the district court erred in adopting the ICC decision which considered equitable defenses and found that it would be an unreasonable practice in violation of 49 U.S.C. § 10701 for the carrier to recover tariff charges that were higher than the charges previously agreed to by the carrier and the shipper.

Section 10761(a) of the Interstate Commerce Act requires that common carriers collect the rate published in their tariffs. 49 U.S.C. § 10761(a). In the past, a party's mistake or ignorance of the applicable tariff rate, or even carrier misquotation of the correct tariff rates, was not an excuse for paying less than the tariff rate. *See, e.g., Louisville & Nashville R.R. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915). This rule, known as the "filed rate doctrine," was enforced to uphold the anti-discriminatory goals of the public tariff filing system, whereby every shipper could be assured that it was paying the same rate as other shippers for common carriage service. Requiring strict adherence to the tariff was intended to avoid intentional tariff misquotation of rates as a means to offer secret discounts to particular shippers. *See* S.Rep. No. 46, 49th Cong., 1st Sess. 181, 188–90, 198–200 (1886); *Western Transp. Co. v. Wilson & Co.,* 682 F.2d 1227, 1230–31 (7th Cir.1982).

In *Buckeye Cellulose Corp. v. Louisville & Nashville R.R. Co.,* 1 I.C.C.2d 767 (1985), *aff'd sub nom. Seaboard System R.R. Co. v. United States,* 794 F.2d 635 (11th Cir.

1986), the ICC modified its interpretation of the filed rate doctrine to permit equitable defenses in a tariff applicability case involving a rail carrier. Subsequently, in *Negotiated Rates,* the ICC addressed complaints by shippers that some motor carriers were abusing rate flexibility newly established by the Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793, by exploiting the ICC's traditional strict enforcement of filed tariffs.[4] Typically, shippers complained that motor carriers quoted and billed rates lower than those set forth in the tariffs and then later the carrier, or more typically its trustee in bankruptcy, would bill the shipper at the higher tariff rate. The ICC concluded: "our former policy of penalizing shippers for carriers' mistakes regardless of the circumstances is unnecessary and inappropriate to deter discrimination under today's statutory scheme." *Negotiated Rates,* 3 I.C.C.2d at 105. The ICC stated that by evaluating the circumstances of each case, it could determine if the carrier's actions constituted an "unreasonable practice."

Maislin argues that the ICC's interpretation of the filed rate doctrine in *Negotiated Rates* is contrary to law, and that the district court is precluded from applying that interpretation because of prior judicial precedent, which strictly construed section 10761 as requiring the filed rate doctrine. *See, e.g., Maxwell,* 237 U.S. 94, 35 S.Ct. at 494; *Paulson v. Greyhound Lines, Inc.,* 804 F.2d 506 (8th Cir.1986). Maislin relies on several Supreme Court cases which strictly construed the filed rate doctrine. In *Square D Co. v. Niagara Frontier Tariff Bureau,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986), the Supreme Court held that shippers could not use antitrust law to challenge the legality of tariff rates filed with the ICC, even where the carrier conspired to fix rates in violation of the Sherman Act, because the rates had been approved by the ICC. *Id.* at 415–16, 106 S.Ct. at 1926–27. In *Maxwell,* the Supreme Court held that the lawfully filed rate of the carrier must be charged by the carrier

---

**4.** The Motor Carrier Act of 1980 relaxed regulatory requirements and ICC oversight, thereby allowing far more pricing freedom and increasing competition among carriers.

and paid by the shipper, and that a shipper is not excused from paying the full amount of the filed tariff. In both *Square D* and *Maxwell,* however, the rates enforced by the Court were presumptively reasonable because they had been approved by the ICC. Therefore, collection of those rates was mandated by law. Neither case concerned rates or practices deemed to be unreasonable by the ICC. The "courts have never held that the *Commission* lacks authority to prohibit the unreasonable collection of undercharges" under section 10701. *Seaboard,* 794 F.2d at 638 (emphasis added).

Section 10761(a), which mandates the collection of tariff rates, is only part of an overall regulatory scheme administered by the ICC, and there is no provision in the Interstate Commerce Act elevating this section over section 10701, which requires that tariff rates be reasonable. When conflicts between the two provisions arise, "it is not for * * * [courts] to place enforcement of one doctrine above the other." *In re Tucker Freight Lines,* 85 B.R. at 429. Instead, the proper authority to harmonize these competing provisions is the ICC. *Seaboard,* 794 F.2d at 638. The approach taken by the ICC does not abolish the filed rate doctrine, but merely allows the ICC to consider all of the circumstances, including equitable defenses, to determine if strict adherence to the filed rate doctrine would constitute an unreasonable practice.

Our position is supported by similar cases from other circuits involving the filed rate doctrine. In *Seaboard,* 794 F.2d 635, the court affirmed the ICC's decision that a railroad's recovery of undercharges would be an unreasonable practice, prohibited by 49 U.S.C. § 10701, where the carrier's tariff was unclear to the ordinary user and the shipper relied on the carrier's quotation of the applicable rate. The court concluded:

> The Interstate Commerce Act, as amended, still embodies the policies of nondiscrimination and uniformity. The primary authority to give effect to those policies, though, is reposed in the ICC. * * * The Commission in this case merely refused to allow the carrier to collect its under-

charge when there was no evidence that the carrier intentionally or knowingly undercharged, when waiving the undercharges was unlikely to encourage carriers to indulge in intentional discriminatory rate "misquotations," and when the shipper relied upon the carrier's continuing conduct in misleading the shipper as to the applicable rate under a confusing tariff. The Commission did not abolish the requirement of 49 U.S.C. 10761(a) that carriers must charge the tariff rate.

*Seaboard,* 794 F.2d at 638 (citations omitted).

■ Also, in *Western Transp. Co.,* 682 F.2d at 1231, the Seventh Circuit held that although it was not empowered to consider equitable defenses by waiving the filed rate doctrine:

> it does not follow that the shipper is necessarily without any remedy in a case like this. A tariff provision has to be reasonable. *See* 49 U.S.C. § 10704(a). If it is not, it violates the statute; and the Commission, either on its own initiative or on complaint, "shall take appropriate action to compel compliance with" the statute. 49 U.S.C. § 11701. If the notation requirement is, as it appears to be, entirely pointless, the Commission can be expected to set aside this part of the tariff * * *. * * * Wilson should have done what Iowa Beef Processors, Inc., another of Western's customers, did when sued by Western in bankruptcy court on the very tariff in issue on this case—ask for stay of the court proceedings and then ask the Commission to declare the notation requirement unreasonable.

Thus, the district court is required to enforce the tariff provisions of section 10761(a), unless the ICC, upon referral by the district court, determines that a carrier's billing practices were unreasonable and that to enforce the tariff requirement would be unlawful.

Maislin further argues that the ICC does not have the authority to change its policy concerning the filed rate doctrine as it can point to no specific statutory change in the

Motor Carrier Act of 1980. We are not persuaded. In *American Trucking Ass'n, Inc. v. Atchison Topeka & Santa Fe Ry. Co.*, 387 U.S. 397, 416, 87 S.Ct. 1608, 1618–19, 18 L.Ed.2d 847 (1967), the Supreme Court stated:

> the Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice. * * *. Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy.

The ICC may therefore alter its past interpretation and we must accept that change if the new interpretation is reasonable. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984) ("considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer"). Here, the ICC evaluated the effects of the relaxed regulatory requirements in the Motor Carrier Act of 1980. It concluded that giving effect to negotiated rates, through its jurisdiction to enforce "reasonable practices" under section 10701, can avoid injustice without undermining the anti-discrimination goals of the filed rate doctrine. *Negotiated Rates*, 3 I.C.C.2d 99. The ICC further explained that in light of the regulatory changes "the inability of a shipper to rely on a carrier's interpretation of a tariff is a greater evil than the remote possibility that a carrier might intentionally misquote an applicable tariff rate to discriminate illegally between the shippers." *Seaboard*, 794 F.2d at 638 (quoting *Buckeye*, 1 I.C.C.2d 767). We believe that the ICC decision represents a reasonable accommodation of conflicting policies that were committed to its administration by the Interstate Commerce Act.

The district court adopted the factual findings of the ICC in determining that collection of the undercharges would be an unreasonable practice. The parties do not challenge the ICC's findings of fact. Maislin continually urges that the ICC's decision was no more than advisory, relying upon language in *Negotiated Rates. See* 3 I.C.C.2d at 107 (stating it was undertaking an "advisory analysis"). Viewed in context, the ICC simply recognized the allocation of responsibility between it and the courts, and that after it evaluates the reasonableness of a practice, the courts retain authority to structure a proper remedy. Maislin's semantic argument is not persuasive to us. *See Pennsylvania R.R. Co. v. United States*, 363 U.S. 202, 205, 80 S.Ct. 1131, 1133, 4 L.Ed.2d 1165 (1960) (ICC decision finding rates unreasonable was "by no means a mere 'advisory opinion' ").

### III.

Maislin's argument that it is entitled to prejudgment interest computed from the dates of the shipments at issue need not be addressed, as we have affirmed the district court's determination that Primary Steel is not liable for the amount of undercharges below the filed tariff rate.

Accordingly, we affirm the judgment of the district court.