**INF, LTD., Appellee,**

v.

**SPECTRO ALLOYS CORP., Appellant.**

**No. 88–5324.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1989.

Decided Aug. 3, 1989.

Rehearing and Rehearing En Banc Denied Sept. 15, 1989.

James R. Scoggin, Eden Prairie, Minn., for appellant.

Paul O. Taylor, Bloomington, Minn., for appellee.

Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and BRIGHT, Senior Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

INF, Ltd., a freight carrier, sued Spectro Alloys Corp., a metal products manufacturer, to collect the difference between the rate quoted by INF and the higher applicable tariff rate filed with the Interstate Commerce Commission. Spectro now appeals from an adverse summary judgment in which the district court held that, under the "filed rate doctrine," Spectro's reliance on the quotation of a tariff by INF did not excuse Spectro from paying the applicable tariff rate. The district court had referred to the ICC the question of whether INF would be engaging in an unreasonable practice in requiring Spectro to pay the difference between the rate INF charged and the filed tariff rate. By a three-two vote, the ICC held that INF's collection of undercharges would be an unreasonable practice in violation of 49 U.S.C. § 10701. The district court held that under 49 U.S.C. § 10761, Spectro must pay and INF must collect the applicable rate on file with the ICC, regardless of the ICC's determination that such a practice is unreasonable. 690 F.Supp. 808 (1988). As we hold that the district court erred by strictly adhering to the tariff requirements of section 10761 when the ICC has determined that to impose the filed tariff rate would be unreasonable, we reverse.

In 1983, INF solicited business from Spectro to transport Spectro's goods. Although INF knew that the commodities it was to ship for Spectro were aluminum and aluminum alloy, INF quoted and Spectro agreed to pay a rate based upon the "iron and steel" tariff that INF had filed with the ICC. During 1983 and 1984, INF made 124 shipments for Spectro, for which Spectro paid this iron and steel rate. In December, 1984, INF's parent corporation filed for reorganization under Chapter 11 of the Bankruptcy Code. Auditors appointed by the bankruptcy court concluded that INF had improperly charged Spectro with the iron and steel rate instead of the "freight, all kinds rate." According to the auditors, Spectro was undercharged by $22,460.70.

INF brought this action seeking payment of the under charges. Upon Spectro's mo-tion, the district court referred the case to the ICC to determine whether INF's demand for payment of the alleged undercharges constituted an "unreasonable practice" under 49 U.S.C. § 10701.

In a three-two vote, the ICC determined that the iron and steel rate applied by the parties in the transaction occurred as a result of negotiations between the parties; INF solicited Spectro's business and quoted what it believed to be competitive rates, and Spectro accepted and paid the quoted rate. The ICC also found that Spectro reasonably relied on INF's rate quotation. Relying on its decision in *National Indus. Transp. League—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates, Ex Parte No. MC–177,* 3 I.C.C.2d. 99 (1986), (hereafter *Negotiated Rates*), which held that the ICC could consider equitable defenses to determine if the collection of undercharges is a reasonable practice, the ICC concluded that it would be an unreasonable practice to require Spectro to pay the difference between the appropriate tariff rate (the freight, all kinds rate) and the iron and steel rate. Two commissioners dissented, arguing that the *Negotiated Rates* policy did not apply to this situation as the case involved the application of an incorrect published rate, not a negotiated unpublished rate.

On motion by both parties for summary judgment, the district court held that Spectro was not excused from paying the full amount of the applicable freight, all kinds rate. The court reasoned that it was bound by the "filed rate doctrine," an interpretation of 49 U.S.C. § 10761 which mandates that carriers collect the rate published in their tariffs. Recognizing that the ICC could nevertheless evaluate equitable considerations in determining whether a carrier's rate or practice was reasonable, the district court held that it did not have the power to consider such equitable defenses. Thus, the district court determined that it could not follow the ICC decision because it was required to adhere strictly to the filed rate doctrine.

We first confront the issue of whether the question presented here—whether

INF's practice of assessing and rebilling Spectro for the filed tariff rate constituted an unreasonable practice—was properly within the primary jurisdiction of the ICC. INF contends that the issue was not within the ICC's primary jurisdiction as it is a question of law and within the competency of the judiciary. INF claims that the ICC decision constituted only an advisory opinion not binding on the district court. In its order referring the issue to the ICC, the district court cited *Seaboard Sys. R.R., Inc. v. United States*, 794 F.2d 635, 638 (11th Cir.1986), for the proposition that "[d]etermining whether a carrier's practice is unreasonable is the kind of determination that lies in the primary jurisdiction of the Commission." The district court recognized that the ICC historically had refused to order the waiver of undercharges, but that the ICC now acknowledges that it may consider equitable defenses to 49 U.S.C. § 10761, which requires a motor carrier to collect the rate filed with the ICC. *See Negotiated Rates*, 3 I.C.C.2d 99.

■ In *Maislin Indus. & U. S., Inc. v. Primary Steel, Inc.*, 879 F.2d 400 (8th Cir. 1989), which was argued on the same day as this case and presented a similar factual situation, we have decided that the reasonableness of a carrier's billing practices and efforts to collect undercharges are matters involving the special expertise of the ICC and are therefore within the ICC's jurisdiction. *Id.* at 403–404. *See also Iowa Beef Processors, Inc. v. Illinois Cent. Gulf R.R. Co.*, 685 F.2d 255, 259 (8th Cir.1982); *Delta Traffic Serv., Inc. v. Marine Lumber Co.*, 683 F.Supp. 754 (D.Or.1987); *Motor Carrier Audit & Collection Co. v. Family Dollar Stores, Inc.*, 670 F.Supp. 644 (W.D.N.C. 1987). *Maislin* dictates that we affirm the district court's conclusion that the reasonableness of INF's billing practice was properly within the ICC's primary jurisdiction.

We next decide whether the district court erred in enforcing the filed rate doctrine, disregarding the ICC decision which held that requiring Spectro to pay the difference between the applicable filed rate and the iron and steel rate would be unreasonable under 49 U.S.C. § 10701. While the district court, citing *Negotiated Rates*, recognized that the ICC has the power to consider equitable defenses and to declare a billing practice unreasonable, it held that it must strictly apply the filed rate doctrine and disallow Spectro's equitable defense, despite the ICC's decision. The court relied on *Louisville & Nashville R.R. Co. v. Maxwell*, 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915), where the Supreme Court established the filed rate doctrine in holding that reliance on a carrier's misquotation of price does not excuse the purchaser from paying the correct rate.

■ Again, we rely on *Maislin*, where we held that the filed rate doctrine does not bar the ICC from applying equitable defenses to determine whether the collection of undercharges is an unreasonable practice in violation of 49 U.S.C. § 10701. 879 F.2d at 404–406. In *Maislin* we analyzed the filed rate doctrine, and recognized the authority of the ICC to balance section 10761(a), mandating collection of the tariff rates, with section 10701, requiring that rates be reasonable. We concluded that the ICC had the authority to change its policy concerning the filed rate doctrine, and that its policy change was reasonable. *Id.* at 406. The district court in this case did not know of our holding in *Maislin*. Accordingly, we conclude that the district court erred in ruling that the filed rate doctrine requires collection of the undercharges, in spite of the ICC's decision that to do so would be unreasonable.

Although the district court recognized that the Eleventh Circuit had affirmed an ICC decision which held that the collection of undercharges was unreasonable, *see Seaboard*, 794 F.2d 635, it held that *Seaboard* did not apply, as it involved the direct appeal of an ICC order rather than the referral of the issue to the ICC by a district court. We differ from this conclusion. *Seaboard* held that a court may not consider equitable defenses, but plainly approved the ICC's consideration of equitable defenses in determining whether or not a practice was unreasonable. 794 F.2d at

638. There is a clear division between the responsibilities of the district court and the ICC. The ICC may render an opinion as to whether it would be an unreasonable practice for the carrier to collect the undercharges, and the district court in reviewing this decision may then, if it concludes it is appropriate, fashion the necessary remedy. This does not require the court itself to apply the equitable defenses, but simply to accept or reject the ICC's finding that there was an unreasonable practice.

INF argues that the question in this case, whether the filed rate doctrine bars equitable defenses, is one of law, and therefore contends that the district court correctly rejected the ICC's decision without determining that it was arbitrary, capricious or unsupported by substantial evidence. *See Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 619–21, 86 S.Ct. 1018, 1026–27, 16 L.Ed.2d 131 (1966); *see also Erickson Transp. Corp. v. ICC*, 728 F.2d 1057, 1062 (8th Cir.1984) (per curiam). We, however, do not view the determination of the ICC as one involving only a question of law.[1] In considering whether to find a carrier's practice unreasonable in an action for the collection of undercharges, the ICC has stated that a decision in favor of a shipper requires findings of these elements: (1) that a rate other than the applicable tariff rate was quoted by a carrier, and that an agreement to use that rate was reached, and (2) that the shipper reasonably relied on the quote. *Wakefern Food Corp. v. Southwest Freight Lines, Inc.*, 3 I.C.C.2d 814 (1987). In this case the question as to whether a rate was negotiated presents a close factual question.[2] INF vigorously claimed that the parties simply misapplied the iron and steel tariff to aluminum products. To the contrary, Spectro argued that the rate applied was negotiated. The ICC determined the threshold issues that the amounts quoted were "reached as the result of negotiations," and that Spectro was entitled to rely upon INF's quotation. It then proceeded to the ultimate statutory issue, which involves inherently factual inquiries, and found that "it would be an unreasonable practice now

1. While this case was pending, the ICC issued an opinion in *Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates, Ex Parte MC–177*, 5 I.C.C.2d 623 (1989), which was decided on June 14 and served on June 29. The ICC states that its unreasonable practice findings are "legal, rather than purely equitable determinations and derive from its obligation under § 10701 to ensure that practices * * * are reasonable." *Id.* at 628. This language addresses the distinction between legal as opposed to equitable determinations, but our discussion points to the ultimate legal conclusion under the statute encompassing the factual findings that are involved in reaching this ultimate determination.

2. The ICC order recited the facts concerning the negotiation as follows:

The evidence here discloses that INF's president solicited the traffic and quoted what he knew to be a competitive rate for the traffic. Spectro accepted and paid for the transportation services at the quoted rates. Spectro relied on INF to implement properly the quoted rates. INF's failure to do so, despite Spectro's lack of vigilance, should, in these circumstances, preclude INF's later collection of undercharges. There is absolutely no evidence that Spectro agreed to pay any more than the amount INF originally quoted and billed for each shipment. There is no evidence that INF ever demanded additional amounts over the amounts it billed at any time during its business relationship with Spectro. The carrier's president at the time of the negotiations and transportation clearly states that the traffic could not have moved competitively under the freight all kinds rates. We find that Spectro reasonably believed that the amounts quoted and billed by INF were the correct total charges for the transportation services it performed, that the amounts were reached as the result of negotiations between Spectro and INF, and that, since full payment was made by Spectro, INF is equitably entitled to collect no more.

3. *Summary.* The evidence here shows that INF's president, Mr. Freese, quoted rates to Spectro in order to induce it to tender the aluminum traffic and Spectro agreed to tender its aluminum shipments at those rates. Spectro, moreover, reasonably relied on Mr. Freese and his quotation in view of the fact that he was the firm's top management official. It would be inequitable to ignore proven rate negotiations and Spectro's reasonable reliance on the assurances of INF's president simply because inflexible adherence to the "filed rate doctrine" would suggest otherwise. In light of our conclusion that negotiated rates existed, we find that it would be an unreasonable practice now to require Spectro to pay undercharges for the difference between the negotiated rates and the tariff rates.

to require Spectro to pay undercharges." These findings channel further consideration of this case.

The ICC's factual finding that the rate charged was negotiated and its ultimate determination that the practice of collecting undercharges is unreasonable may not be set aside unless the ICC's findings are arbitrary, capricious, or unsupported by substantial evidence. The district court did not reach this issue because INF, in arguing that the issue presented was purely legal, did not assert such an argument, nor does it do so in this appeal. The district court's opinion may be read as accepting INF's position that the wire and steel tariff was misquoted and misapplied to aluminum products. In doing so, the court appears to ignore the finding of the ICC that there was a negotiated rate. It failed, however, to use the only proper legal basis for rejecting an ICC finding, namely, that it was arbitrary, capricious or unsupported by substantial evidence. *See Erickson Transp.*, 728 F.2d at 1063 ("the reviewing court is not to substitute its conclusions for those of the Commission.") Thus, there is no basis for the district court to reject the ICC's decision that the practice of collecting undercharges was unreasonable.

The district court stated that even if it were allowed to depart from the filed rate doctrine such a departure should not be premised on a "closely divided administrative decision in this fluctuating area of law." We differ with the district court's conclusion. Administrative bodies as well as appellate courts may resolve controversies by a one vote margin.[3] In such instances, the majority decision controls. As we read the dissenting opinions, both commissioners take issue with the majority's factual finding that there was a negotiated rate and that Spectro reasonably relied on the rate, and then argue that *Negotiated Rates* was not intended to be applied so broadly as to cover the misquotation of a tariff rate. We believe, however, that because the dissenting commissioners in es-

sence base their argument on factual findings of the majority with which they differ, the district court should have considered and applied the majority findings unless it rejected them as arbitrary, capricious, or unsupported by substantial evidence.

In sum, we conclude that the district court erred in holding that because it was bound by the filed rate doctrine, it could not adopt the ICC's decision. Accordingly, as no issue was raised other than this legal question we have decided adversely to INF, we reverse the district court's order granting summary judgment in favor of INF and remand the case to the district court with instructions to grant Spectro's motion for summary judgment.

---

3. News sources report that the United States Supreme Court decided from 31 to 34 cases on a five-four basis in the term just ended, depending on which newspaper article is read. We need not make our own count of the decisions, but it is evident that a substantial percentage of cases are so decided and that this does not detract from their finality.