**TRANS–ALLIED AUDIT COMPANY, INC., Plaintiff,**

v.

**RAM TRANS, INC., Defendant.**

**Civ. A. No. 89–M–1498.**

United States District Court, D. Colorado.

Nov. 13, 1989.

David S. Oppenheim, Englewood, Colo., Paul O. Taylor, Harris and Taylor, Minneapolis, Minn., for plaintiff.

Nancy P. Bigbee, Denver, Colo., for defendant.

### MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

This is an action brought pursuant to the Interstate Commerce Act ("ICA"), 49 U.S.C. §§ 10101 *et seq.*, for the collection of $5,090.75 in freight charges. Under the ICA, most firms that provide interstate transportation services must file with the Interstate Commerce Commission ("ICC") a tariff containing certain routing and rate information. In this action, the plaintiff

seeks to collect freight "undercharges," the difference between shipping rates filed in the carrier's tariff and those actually charged a customer. The defendant has filed a motion for a stay of proceedings in this court and referral of the case to the ICC for an opinion on the reasonableness of the filed rates and defendant's liability for those rates.

In 1985 and 1986, defendant Ram Trans, Inc. ("RTI") contracted to have twelve loads of freight delivered. The invoice for each shipment bears the caption "Rose Freight Lines, Inc." ("Rose Freight"), although three of the invoices indicate that the shipment was actually carried by "CJS Trucking." Similarly, one shipment was trucked by "Dave Kloes." Rose Freight carried the other eight loads. RTI was billed a total of $7,817.25 for these shipments, and apparently paid those charges in full.

Plaintiff Trans–Allied Audit Company, Inc. ("Trans–Allied") is the assignee of Rose Freight's rights under the trucking contracts with which RTI is connected. Trans–Allied's complaint alleges that the rates charged RTI under the invoices were a total of $5,090.75 less than those filed in the Rose Freight's tariffs, and claims to be owed that amount.

RTI's answer raises several defenses, among them a claim that the tariff-based charges Trans–Allied seeks to collect, while perhaps "legal," are not "lawful." RTI also claims that a "motor freight broker," Rose Siercks, d/b/a Rose Freight Agency ("RFA"), acted as an intermediary between it and Rose Freight in the trucking agreements. RFA's role in the transactions, claims RTI, precluded privity of contract between RTI and the trucking companies, and thus exempted RTI from paying the tariff rate for any of the shipments. At bottom, RTI claims that Trans–Allied's attempt to collect the undercharges on these facts constitutes an unreasonable tariff practice under 49 U.S.C. § 10701(a), and is accordingly unlawful. The referral motion rests on RTI's position that "[o]nly the ICC has jurisdiction to determine whether a legal rate is a lawful rate." Defendant's

Motion for Stay and Reference to the Interstate Commerce Commission ("RTI's Motion") at 2. Finally, RTI argues that this court should stay the present proceedings pending ICC resolution of the reasonableness issue.

In response, Trans–Allied argues that RTI must pay the shipping rate published in Rose Freight's ICC tariff under the "filed rate doctrine," which derives, as relevant here, from 49 U.S.C. § 10761(a). Section 10761(a) provides in pertinent part: "a carrier providing transportation or service subject to the jurisdiction of [the ICC may not] charge or receive a different compensation for that transportation or service than the rate specified in the [ICC] tariff." Courts have traditionally construed this section strictly, requiring persons making shipments to pay the entire tariff rate, even if the carrier misrepresented the rate to the customer, defrauded him with respect to the rate, or negotiated at arm's length for a lower price. *See e.g., Thurston Motor Lines v. Jordan K. Rand, Ltd.,* 460 U.S. 533, 534, 103 S.Ct. 1343, 1343–44, 75 L.Ed.2d 260 (1983) ("The Interstate Commerce Act requires carrier to collect and consignee to pay all lawful charges duly prescribed by the tariff in respect of every shipment") (quoting *Louisville & Nashville R.R. v. Rice,* 247 U.S. 201, 202, 38 S.Ct. 429, 429, 62 L.Ed. 1071 (1918)); *Louisville & Nashville R.R. v. Central Iron Co.,* 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924) ("No contract of the carrier could reduce the amount legally payable" under the tariff. "Nor could any act or omission of the carrier ... estop or preclude it from enforcing payment of the full amount" due); *Louisville & Nashville R.R. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915) ("Deviation from the [tariff rate] is not permitted upon any pretext"). The Tenth Circuit Court of Appeals has consistently applied the filed rate doctrine. *See Atchison, Topeka, and Santa Fe Ry. Co. v. Bouziden,* 307 F.2d 230, 235 (10th Cir.1962) ("it is well settled that no act or omission of the carrier will estop or preclude it from enforcing payment of the amount due under a lawful tariff"); *accord Empire Petroleum Co. v.*

*Sinclair Pipeline Co.*, 282 F.2d 913, 916 (10th Cir.1960); *Bernstein Bros. Pipe & Mach. Co. v. Denver & Rio Grande W. R.R. Co.*, 193 F.2d 441, 444 (10th Cir.1951); *T. & M. Transp. Co. v. S.W. Shattuck Chem. Co.*, 158 F.2d 909, 910 (10th Cir. 1947); *see also Bartlett–Collins Co. v. Surinam Navigation Co.*, 381 F.2d 546, 549 (10th Cir.1967) (citing the *Empire Petroleum* rule with approval).

Courts have disagreed about the role of the ICC in collection actions. The Fifth Circuit Court of Appeals has twice refused referrals. *See In re Caravan Refrigerated Cargo, Inc.*, 864 F.2d 388, 392 (5th Cir.1989); *Southern Pac. Transp. Co. v. San Antonio, Texas*, 748 F.2d 266, 270–74 (5th Cir.1984). Judge Carrigan reached the same conclusion in *Motor Carrier Audit & Collection Co. v. United Food Serv., Inc.*, slip op., No. 87–C–298, 1987 WL 19008 (D.Colo. May 7, 1987). In contrast, the eighth circuit has on two occasions approved referrals on the basis of the "primary jurisdiction" doctrine. *See INF, Ltd. v. Spectro Alloys Corp.*, 881 F.2d 546, 548 (8th Cir.1989); *Maislin v. Primary Steel, Inc.*, 879 F.2d 400, 403–06 (8th Cir.1989); *see also Seaboard Sys. R.R. v. United States*, 794 F.2d 635, 639 (11th Cir.1986) (noting that some filed rate cases are within the ICC's primary jurisdiction).

■■ Among the key factors in applying the doctrine of primary jurisdiction are the judiciary's familiarity with the issue presented, the need for consistency in deciding the issue, and the question whether the decision involves the agency's administrative discretion. *Marshall v. El Paso Natural Gas Co.*, 874 F.2d 1373, 1377 (10th Cir.1989) (citing *Far East Conference v. United States*, 342 U.S. 570, 574–75, 72 S.Ct. 492, 494–95, 96 L.Ed. 576 (1952)). Agency expertise may also be a significant consideration. *See Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 305, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976); *United States v. Western Pac. R.R.*, 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956); *Far East Conference v. United States*, 342 U.S. at 574–75, 72 S.Ct. at 494–95. *But see United States v. Zweifel*, 508 F.2d 1150,

1156 (10th Cir.) ("Whether the agency happens to be expert or not, a court should not act upon a subject matter that is peculiarly within the agency's specialized field without taking into account what the agency has to offer") (quoting 3 K. Davis, *Administrative Law Treatise* § 19.01 (1958)), *cert. denied*, 423 U.S. 829, 96 S.Ct. 47, 46 L.Ed.2d 46 (1975). When a case presents an issue that is within an agency's primary jurisdiction, the judicial process may be suspended pending administrative action. *Marshall v. El Paso Natural Gas Co.*, 874 F.2d at 1377.

Primary jurisdiction arguments are resolved on a case-by-case base, the key questions in each dispute being "whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *United States v. Western Pac. R.R.*, 352 U.S. at 64, 77 S.Ct. at 165. The decision whether to refer therefore hinges on the precise nature of the issue sought to be referred. In *Maislin v. Primary Steel, Inc.*, for example, the defendant moved to refer to the ICC the question whether the plaintiff's practice of negotiating with customers for a subtariff rate and then suing to collect the undercharge constituted an unreasonable tariff practice under 49 U.S.C. § 10701(a). 879 F.2d at 403. The Eighth Circuit Court of Appeals held that because the determination "directly involves the reasonableness of Maislin's billing practices," the issue was within the ICC's primary jurisdiction. *Id.* Such a determination was necessary before a filed rate would be enforced, because 49 U.S.C. § 10701 requires that all tariff rates and practices be "reasonable." The court concluded that since Maislin's practice of billing shippers for the tariff rate after first negotiating a lower rate was not presumptively reasonable, referral was appropriate. *See also Brown v. Associated Distrib.*, 715 F.Supp. 729, 731–32 (E.D.Va.1989) (referring to the ICC a defendant's vague claim that the plaintiff's attempts to collect the undercharge resulting from a negotiated rate was unreasonable); *accord Delta Traffic Serv. v. Marine Lumber Co.*, 683 F.Supp. 754 (D.Or.

1987); *Motor Carrier Audit & Collection Co. v. Family Dollar Stores, Inc.*, 670 F.Supp. 644, 649 (W.D.N.C.1987). Similarly, at least one district court has held that the question whether the tariff rates the plaintiff was seeking to enforce were themselves reasonable was within the ICC's primary jurisdiction. *See Rebel Motor Freight, Inc. v. Southern Beverage Co.*, 673 F.Supp. 785, 788 (M.D.La.1987) (listing the question "whether the 'undercharges' claimed by plaintiff exceed a maximum reasonable level for the service actually provided" as one to be referred to the ICC).

Underlying these decisions is the view that there are equitable reasons for rejecting application of the filed rate doctrine. *See, e.g., Maislin v. Primary Steel, Inc.*, 879 F.2d at 404–6; *INF, Ltd., v. Spectro Alloys Corp.*, 881 F.2d at 547–48; *Brown v. Associated Distrib.*, 715 F.Supp. at 732 ("cracks may be appearing in the filed rate doctrine armor"); *Motor Carrier Audit & Collection Co. v. Family Dollar Stores*, 670 F.Supp. at 650 (finding "appropriate" the defendant's "attempt to set up an equitable defense of estoppel to the Plaintiff's 'filed rate' based claim" by moving for referral to the ICC). The ICC has ruled that in some circumstances equitable defenses may be raised to undercharge actions. *See Ex Parte MC–177, Petition to Institute Rulemaking on Negotiated Motor Carrier Rates*, 5 I.C.C.R.2d 623, 623–31 (1989).

■ Decisions that permit the raising of equitable defenses in filed rate cases plainly conflict with the Supreme Court cases cited above that rigidly enforce the filed rate doctrine. In *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 425, 106 S.Ct. 1922, 1931, 90 L.Ed.2d 413 (1986), the Court stated, "if there is to be an overruling of [a rule analogous to the filed rate doctrine], it must come from Congress, rather from this Court." This court is also bound by the related rule that: "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989). Absent a change made by Congress, the Supreme Court, or the Tenth Circuit Court of Appeals, this court must apply the filed rate doctrine in collection cases.

■ RTI's pleadings set out two claims of unreasonable activity that it argues are within the ICC's primary jurisdiction. *See* RTI's Motion at paragraph 2 (referencing its answer at paragraphs 7–13). First, RTI claims that RFA's brokering activities precluded privity of contract between itself and the trucking companies, thus exempting the transactions from the filed rate doctrine insofar as RTI is concerned. That is an issue of law for this court to decide. Statutory construction is manifestly "within the conventional competence of the courts." *See Nader v. Allegheny Airlines*, 426 U.S. at 305, 96 S.Ct. at 1987 (noting that such issues should not be referred under the primary jurisdiction doctrine). It is in fact one of the judiciary's most traditional roles. Consequently, the question whether the use of a motor freight broker exempts a customer from the filed rate is not within the ICC's primary jurisdiction.

■ RTI's second allegation of unreasonableness is its naked claim that the rates filed by Rose Freight with the ICC, and pursuant to which Trans Allied is bringing this action, are themselves unreasonable. The defendant has offered nothing to support this allegation. The doctrine of primary jurisdiction may not be invoked in this manner. *See United States v. Western Pac. R.R.*, 352 U.S. at 68–69, 77 S.Ct. at 167 ("[T]he mere fact that the issue is phrased . . . as a matter of reasonableness should not be determinative on the jurisdictional issue. To hold otherwise would make the doctrine of primary jurisdiction an abstraction to be called into operation at the whim of the pleader"). RTI's claim that the filed rates are unreasonable constitutes only a "weak assertion[ ] [that is] not sufficient to justify the added expense and delay necessarily entailed by referral."

*Observer Transp. Co. v. Service Merchandise Co.*, 685 F.Supp. 120, 123 (W.D.N.C. 1988).

Upon the foregoing, it is

ORDERED that the defendant's motion for a stay in this court and referral of this case to the Interstate Commerce Commission is denied.