SEABOARD SYSTEM RAILROAD,
INC., Petitioner,

and

the Buckeye Cellulose Corporation,
Intervenor-Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

No. 85-3425.

United States Court of Appeals,
Eleventh Circuit.

July 24, 1986.

Fred R. Birkholz, Jacksonville, Fla., for petitioner.

Michael P. Coury, Memphis, Tenn., for intervenor Buckeye Cellulose Corp.

Evelyn G. Kitay, I.C.C., John J. Powers, III, Marion L. Jetton, U.S. Dept. of Justice, Antitrust Div., Washington, D.C., for respondents.

Before RONEY and FAY, Circuit Judges, and SIMPSON, Senior Circuit Judge.

RONEY, Circuit Judge:

The railroad in this petition for review of an ICC order seeks to collect undercharges based on a higher single-car rate to a shipper who was promised and received lower multicar rates for shipments between December 1977 and May 1980. The ICC held that the tariff provisions at that time were not ambiguous and that, in any event, the collection of undercharges under the circumstances of this case would be unreasonable. As to the latter decision, the Commission made an abrupt change from former policy which required the collection of undercharges, the difference between the published tariff and the amount charged at the time of shipment, no matter how unfair or unreasonable that might be in a given case. We affirm.

The controlling facts are not complex. Buckeye Cellulose Corporation operates a soybean processing plant at Memphis, Tennessee, from which it ships soybean meal to Mobile, Alabama. Between December 1977 and May 1980, Buckeye shipped 373 shipments of soybean meal to Mobile via L & N Railroad, on which Buckeye or its consignee paid a multicar rate.

Prior to late 1977, Buckeye's shipments to Mobile moved primarily via other carriers, and Buckeye received multicar rates from those carriers. That year, because of difficulty obtaining sufficient cars from these carriers, Buckeye approached L & N for additional service. After an L & N sales manager assured Buckeye of sufficient car supply, Buckeye began making shipments via L & N. Whenever multicar shipments were made by the consignee, the multicar rate was paid to L & N. In late 1978, when Buckeye rather than the consignee assumed responsibility for paying freight charges, Buckeye sought and received assurance from an L & N rate clerk that the multicar rate applied and received subsequent verification from the L & N sales manager. Thereafter, Buckeye's multicar shipments to Mobile were either prepaid or billed by L & N under the multicar rate. Not until November 1979 did L & N advise Buckeye that it did not have a multicar rate from Memphis to Mobile, but only a single-car rate. Until February 1980, however, Buckeye's multicar shipments were billed by L & N and paid by Buckeye at the multicar rate. L & N then began rebilling the shipments at the single-car rate.

Seaboard System Railroad, the successor in interest to L & N, now asserts that L & N published no multicar rate between Memphis and Mobile. Seaboard seeks to collect undercharges of $104,502.46, representing the difference between the multicar rate that was paid and a higher single-car rate that it asserts was the applicable tariff rate. The controversy reflects a somewhat unclear published tariff.

The pertinent tariff entry, published in item 2525–D of supplement 75 to tariff I.C.C. SFA 3705–P, appeared essentially as follows:

| TO AL Mobile FROM | RTE | COL 1 | COL 2 | COL 3 |
|---|---|---|---|---|
| TN Memphis | R8 | .68 | | |
| | R29 | | | .515 |

The bracket to the right of the word "Memphis," known as a "crow's foot," is a typographical device used throughout the tariff, although the tariff does not explain its

meaning. The explanation of route reference "R8" names routes of L & N, the Illinois Central Gulf Railroad Company (ICG), the St. Louis-San Francisco Railway Company (SLSF), and the Southern Railway System (SR). Route reference "R29" refers only to the routes of ICG, SLSF, and SR, and not to those of L & N. The rate in column 1 is a single-car rate, while the lower rate in column 3 is a multicar rate.

Upon receiving the notice in 1979, Buckeye sought an informal opinion from the ICC and was advised by the Chief of the Commission's Section of Rates and Informal Cases that all the rates encompassed by the Memphis bracket, including the multicar rate, applied to all routes encompassed by the bracket, including L & N's route.

The Commission in this proceeding accepted as "plausible" Buckeye's argument that the "crow's foot" or bracket to the right of the word "Memphis," which spanned both the "R8" and "R29" lines, overcame the placement of those lines and made both rates opposite the bracket applicable to all routes referenced opposite the bracket. Buckeye, Continental, and L & N adhered to this reading for over two years, and the Commission's own tariff expert employed it in 1980. Nonetheless, the Commission found the provision unambiguous and that the single-car rate was the applicable rate.

The reasoning was this. To adopt Buckeye's reading would not give effect to all provisions of the tariff. The three routes referenced in "R29" were all referenced, along with others, in "R8." If "R8" pertained to the multicar rate in column 3 as well as the single-car rate in column 1, then route reference "R29" would have been superfluous. In order to give effect to "R29," the tariff must be interpreted as not providing a multicar rate for the L & N route. The bracket, the Commission found, has no significance other than as a device to avoid repetition of the name of the origin point on the second line. The Commission concluded that because this is the only reading that gives meaning to all the terms of the tariff, the tariff must be considered unambiguous.

■ We need not decide that point in order to affirm the Commission in this case. The Commission found that it could inquire into whether it would be an unreasonable *practice* for L & N to collect undercharges under the circumstances presented. Although this decision marks a change from past practice, we hold it is not contrary to the statute and within the Commission's authority.

The Commission identified its authority to prevent unreasonable practices by rail carriers as originating from two statutes: 49 U.S.C.A. § 10701(a), which provides that a "practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title must be reasonable," and 49 U.S.C.A. § 10704(a)(1), which authorizes the ICC to order a carrier to stop a violation.

The Commission found that the publication of a tariff whose meaning is not plain to the ordinary user, combined with a misquotation of the applicable rate under that tariff and a shipper's reliance on the misquotation to its detriment, constitute circumstances under which the Commission may find that the collection of undercharges would be an unreasonable practice. The Commission emphasized that there must be difficulty in interpreting the tariff such that the shipper reasonably relied on the carrier's interpretation and did so to its detriment. Here the tariff, even if not technically ambiguous, lent itself to misinterpretation by the ordinary user, and the shipper relied on L & N's continued misquotations and misbillings, to the shipper's substantial detriment. If the tariff was ambiguous and subject to two interpretations, the case is even stronger to support the Commission's decision.

As the Commission recognized, the courts have long refused to recognize carrier rate misquotations as a defense against legal actions by carriers seeking to collect undercharges. The seminal case was decided almost three quarters of a century

ago and would seem to travelers today to have reached a curious result. In *Louisville & Nashville Railroad v. Maxwell,* 237 U.S. 94, 35 S.Ct. 494, 59 L.Ed. 853 (1915), the Supreme Court held that a railroad passenger had to pay $58.30 on an undercharge for tickets despite the fact that he had relied upon the carrier's price misquotation. "Deviation from [the applicable rate] is not permitted upon any pretext.... Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination." *Id.* at 97, 35 S.Ct. at 495. *See also Southern Pacific Transportation Co. v. Commercial Metals Co.,* 456 U.S. 336, 343–44, 102 S.Ct. 1815, 1820–21, 72 L.Ed.2d 114 (1982); *Louisville & Nashville Railroad v. Mead Johnson & Co.,* 737 F.2d 683 (7th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 386, 83 L.Ed.2d 320 (1984); *Illinois Central Gulf Railroad v. Golden Triangle Wholesale Gas Co.,* 586 F.2d 588, 592 (5th Cir.1978).

The Commission acknowledged in its order that it too historically has refused to order the waiver of undercharges based on carrier rate misquotations, because granting such relief might lead to intentional "misquotations" by carriers seeking to discriminate in favor of particular shippers. Nonetheless, the courts have never held that the Commission lacks authority to prohibit the unreasonable collection of undercharges. In none of the cases cited above had there been a waiver of undercharges by the Commission. As the Commission stated, finding a carrier practice unreasonable is the kind of determination that lies in the primary jurisdiction of the Commission. *See Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 304–05, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976).

The Commission noted that "changed circumstances" warranted a reexamination of its previous policy of refusing to consider equitable defenses. In recent amendments to the Interstate Commerce Act, "Congress has now recognized the undesirable consequences of a statutory scheme that single-mindedly militated against the possibility of rate discrimination at the cost of the ratemaking flexibility needed by railroads to respond to individual shipper needs." Several changes permit activities which formerly were prohibited as discriminatory, and the statute now places greater reliance on market forces. As a result, "the inability of a shipper to rely on a carrier's interpretation of a tariff is a greater evil than the remote possibility that a carrier might intentionally misquote an applicable tariff rate to discriminate illegally between shippers."

The Commission's action in this case is both justified and within its jurisdiction. It is not contrary to *Maxwell* and related cases, as those dealt only with the *courts'* authority to grant equitable defenses to undercharge actions. The Interstate Commerce Act, as amended, still embodies the policies of nondiscrimination and uniformity. The primary authority to give effect to those policies, though, is reposed in the ICC. *Cf. Nader,* 426 U.S. at 304, 96 S.Ct. at 1987. Nothing prohibits the ICC from changing its policy on enforcing the "unreasonable practice" provision of section 10701(a). The Commission in this case merely refused to allow the carrier to collect its undercharge when there was no evidence that the carrier intentionally or knowingly undercharged, when waiving the undercharges was unlikely to encourage carriers to indulge in intentional discriminatory rate "misquotations," and when the shipper relied upon the carrier's continuing conduct in misleading the shipper as to the applicable rate under a confusing tariff. The Commission did not abolish the requirement of 49 U.S.C.A. § 10761(a) that carriers must charge the tariff rate. The statute does not say what remedy is available if less than the tariff rate has in fact been charged and paid for past shipments. That has been worked out by Commission and judicial decision.

Nor does 49 U.S.C.A. § 10707a(h) stand in the Commission's way. That section provides that the Commission, exercising its authority to determine reasonable rules, classifications, and practices, may not use that authority directly or indirectly to limit the rates which rail carriers are otherwise authorized to establish. The Commission's order relates only to the reasonableness of L & N's course of conduct, a concern delivered to the Commission by section 10701(a).

█ When the Commission departs from its settled precedent, it must explain its departure in a manner sufficient to permit judicial review of the Commission's policies. The reviewing court must be able to understand the basis of the agency's action so that it may judge the consistency of that action with the agency's mandate. *See Atchison, Topeka & Santa Fe Railway v. Wichita Board of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973). The argument that the Commission has not sufficiently set forth the basis for its change of position for a judicial determination that the Commission's change in policy is consistent with its statutory mission is almost frivolous. A mere reading of the Commission's decision is all that is necessary to demonstrate it has fulfilled its requirements in this regard.

█ Buckeye argues that it should not be liable for undercharges between November 1979 and February 1980 when the multicar discounting stopped. The Commission's finding of an unreasonable practice was premised, however, on the carrier's continuing conduct in misleading the shipper as to the applicable tariff rate. The Commission found that this conduct ceased when L & N first clearly asserted the applicability of the correct rate in November 1979, and that L & N's conduct was not so unreasonable as to prevent charges for underpayments on shipments occurring after it had given this notice. This finding is not clearly erroneous and is supported by substantial evidence. The Commission's finding of unreasonable practice relates only to shipments prior to November 1979.

█ The ICC asserts that this matter is not properly before this Court and should be dismissed or transferred to the Western District of Tennessee, where litigation concerning this matter originated.

In December 1980, L & N instituted an action against Buckeye in the United States District Court for the Western District of Tennessee, seeking to collect the alleged undercharges. In March 1981, Buckeye filed an administrative complaint before the ICC requesting an investigation and a formal determination that the multicar rate applied and that no undercharges were owed. Buckeye moved to stay the district court proceedings "pending determination of issues of tariff application by the Interstate Commerce Commission." After conducting a hearing, the district court granted Buckeye's request for a stay "pending determination by the ICC of the applicability of the tariff rates."

The jurisdictional question is whether that amounted to a referral, so that the review of the ICC order should go back to that court, or be made on the petition for review filed with this Court.

Under 28 U.S.C.A. § 2321(a), a federal court of appeals has jurisdiction to review ICC orders "[e]xcept as otherwise provided by an Act of Congress." Congress has provided such an exception in 28 U.S.C.A. § 1336(b), which gives a district court jurisdiction to review an ICC decision whenever that court has "referred" a question to the ICC for determination. The Fifth Circuit in *City of New Orleans v. Southern Scrap Material Co.,* 704 F.2d 755 (5th Cir.1983), has concluded that it will not treat a district court stay as a "referral" for the purposes of section 1336(b) unless the district court explicitly states or clearly implies that it is referring the case.

There is no reason to restate here the Fifth Circuit's persuasive reasoning in *City of New Orleans.* We adopt it as our own. The district court here, recognizing the doctrine of primary jurisdiction, merely stayed its proceedings pending the ICC decision. Buckeye did not ask for a referral. The district court made no referral. In these

circumstances, review of the ICC's order is properly before this Court rather than the district court.

AFFIRMED.