**WEST COAST TRUCK LINES, INC., Plaintiff,**

**and**

**Delta Traffic Service, Inc., Plaintiff–Appellant,**

v.

**WEYERHAEUSER CO.; Marine Lumber Co., Defendants–Appellees.**

**Nos. 89–35115, 89–35121 and 89–35167.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 3, 1989.

Decided Jan. 4, 1990.

---

Miles L. Kavaller, Beverly Hills, Cal., for plaintiffs-appellants Delta Traffic Service, Inc., and West Coast Truck Lines, Inc.

William N. Mehlhaf, Case, Dusterhoff & Mehlhaf, Portland, Or., for defendants-appellees Weyerhaeuser Co. and Marine Lumber Co.

Cecelia E. Higgins, Washington, D.C., for intervenor, Interstate Commerce Commission.

Paul Gary Sterling and Mary Kay Reynolds, Meadows, Smith, Lenker, Sterling & Davis, Long Beach, Cal., Amicus Curiae Counsel, William J. Augello, Augello, Pezold & Hirschmann, Huntington, New York, for The Shippers National Freight Claim Council, Inc.

Before WALLACE, PREGERSON and ALARCON, Circuit Judges.

ALARCON, Circuit Judge:

Delta Traffic Service, Inc. (Delta) appeals from the district court's order granting summary judgment in favor of Weyerhaeuser Co. (Weyerhaeuser) and Marine Lumber Co. (Marine). Delta instituted an action to collect interstate motor common

carrier freight undercharges. The alleged undercharges represent the difference between West Coast Truck Lines, Inc.'s (West Coast) published rate on file with the Interstate Commerce Commission (ICC) and the rate negotiated, billed and collected from Weyerhaeuser and Marine.

On referral from the district court pursuant to 28 U.S.C. § 1336(b), the ICC determined that West Coast and Delta's attempt to recover the filed rate constituted an unreasonable practice under 49 U.S.C. § 10701(a) and provided a defense to their claim against Weyerhaeuser and Marine for the collection of undercharges. The district court reviewed the ICC's decision under the Administrative Procedure Act, 5 U.S.C. § 706 and accepted and applied the ICC's finding that West Coast's attempt to collect the undercharges was an unreasonable practice barring any recovery in this action.

We must decide whether the district court erred in accepting as a correct interpretation of the law the ICC's declaratory ruling that an attempt to recover motor carrier undercharges may constitute an unreasonable practice, depending on the facts and circumstances, that will preclude application of the filed rate doctrine. We conclude that the ICC and the district court were correct in determining that an unreasonable practice is an exception to the filed rate doctrine and constitutes a defense to an action for common carrier undercharges, and we affirm.

## I. JURISDICTION

Federal question jurisdiction exists under 28 U.S.C. § 1337 permitting a district court to exercise its judicial power when an action arises under the Interstate Commerce Act, 49 U.S.C. §§ 10701, 10741, 10761 and 10762. *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 534, 103 S.Ct. 1343, 75 L.Ed.2d 26 (1983) (per curiam). A complaint for freight undercharges properly "arises under" section 10761. *Kansas City Terminal Ry. Co. v. Jordon Mfg. Co.*, 750 F.2d 551, 552 (7th Cir.1984). The district court referred the question of the reasonableness of West Coast and Del-

ta's billing practices to the ICC under 28 U.S.C. § 1336(b).

The district court had exclusive jurisdiction to review the ICC's determination. 28 U.S.C. § 1336(b). The district court accepted the ICC's determination that the attempt to recover the undercharges was unreasonable and constituted a complete defense to the complaint. The district court then entered an order granting Weyerhaeuser and Marine's motions for summary judgment. Delta filed a timely notice of appeal. We have jurisdiction under 28 U.S.C. § 1291.

## II. PERTINENT FACTS

West Coast was a motor common carrier subject to regulation by the ICC. It ceased operations in late 1985. West Coast assigned certain accounts to Delta, a collection agency. Marine and Weyerhaeuser employed West Coast while it was conducting business as a carrier.

Marine and West Coast representatives negotiated oral contracts for 108 interstate shipments between September 1983 and December 1984. The negotiated rates were lower than the tariffs filed by West Coast with the ICC for these shipments. Marine was not aware that the negotiated rates were less than the filed rates. Marine paid the negotiated rate for the shipments.

The record shows that West Coast's course of conduct with Weyerhaeuser was similar. During 1984 and 1985 Weyerhaeuser negotiated oral contracts for 104 shipments with West Coast representatives. These negotiated rates were lower than those filed by West Coast with the ICC. Weyerhaeuser was not aware that the negotiated rates deviated from the filed rates. West Coast accepted the amount tendered by Weyerhaeuser as full payment for the shipments.

After auditing West Coast's freight bills, Delta filed a complaint against Marine on September 3, 1986, to collect undercharges in the amount of $14,948.33. This amount represents the aggregate difference between the published rate contained in the tariff filed by West Coast and the rate

actually collected from Marine. On June 30, 1987, West Coast filed a complaint against Weyerhaeuser for aggregate freight undercharges of $11,034.84 for the interstate transportation of green or dry lumber during the period from July 2, 1984, through December 17, 1985, from Oregon to California. On December 18, 1987, the district court stayed the proceedings and referred the question whether an attempt to collect undercharges in a negotiated rate case constitutes an unreasonable practice to the ICC.

On December 27, 1987, Marine and Weyerhaeuser filed a joint petition with the ICC for a declaration that the plaintiffs' attempt to recover the filed rates was an unreasonable practice under the facts presented in support of Delta's complaint.

On April 5, 1988 West Coast filed a new complaint against Weyerhaeuser for freight charges totaling $5,906.98 for additional shipments of lumber and wood products from May through October 18, 1985. On April 25, 1988, by stipulation of the parties, an order was issued staying the district court proceedings pending the decision of the ICC in *Marine Lumber Co. and Weyerhaeuser Co.—Joint Petition for Declaratory Order*, Docket No. MC-C-30082. On June 27, 1988, the ICC found that it would be an unreasonable practice to permit either Delta or West Coast to collect freight undercharges from Marine and Weyerhaeuser based on the carrier's published tariff rates. The ICC based its decision on the Commission's policy statement adopted in *NITL—Petition to Institute Rule on Negotiated Motor Common Carrier Rates*, 3 I.C.C.2d 99 (1986), 1986 Fed.Car.Cas. ¶ 37,284 (CCH) (*Negotiated Rates I*).

On August 22, 1988, Delta filed a motion for summary judgment. Delta asked the district court to reject the ICC's decision. Delta argued that an unreasonable practice does not constitute a defense to an action filed in a district court to collect undercharges. Delta requested enforcement of its filed rates. On October 4, 1988 the district court entered an order consolidating cases *Delta Traffic Service, Inc. v. Marine Lum-*

*ber Co.*, No. CV 86–1124–MA, *West Coast Truck Lines, Inc. v. Weyerhaeuser Co.*, CV 87–689–MA, and *West Coast Truck Lines, Inc. v. Weyerhaeuser Co.*, CV 88–369–MA. Thereafter, Weyerhaeuser and Marine filed motions for summary judgment.

On January 24, 1989, the district court entered an order granting the motions for summary judgment filed by Marine and Weyerhaeuser based on the ICC decision. *Delta Traffic Serv., Inc. v. Marine Lumber Co.*, 705 F.Supp. 513 (D.Or.1989). The district court held that the ICC's decision to accept unreasonable practices defenses to filed rate actions was within the agency's primary jurisdiction and not contrary to law. *Id.* at 517. Because the ICC's application of its unreasonable practices policy to the instant case was supported by substantial evidence, the district court entered the order for summary judgment. *Id.* at 517–18. Delta filed notices of appeal in each of the three consolidated cases on February 3, 1989. In an order issued on May 1, 1989, we consolidated these appeals.

## III. STANDARD OF REVIEW

We review *de novo* an order granting a motion for summary judgment, without deference to the district court's legal conclusions. *Darring v. Kincheloe*, 783 F.2d 874, 876 (9th Cir.1986). The district court's application of the primary jurisdiction doctrine is a question of law reviewable *de novo. Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 778 F.2d 1365, 1370 (9th Cir.1985). Similarly, the district court's determination that the ICC's findings are supported by substantial evidence is subject to *de novo* review. *See Greenhow v. Secretary of Health & Human Servs.*, 863 F.2d 633, 635 (9th Cir.1988) (judicial determination whether agency factual finding is supported by substantial evidence is a question of law); *McCall v. Andrus*, 628 F.2d 1185, 1189–90 (9th Cir.1980) (quoting *Dredge Corp. v. Penny*, 338 F.2d 456, 462 (9th Cir.1964) ("A judicial determination of whether a finding of fact is supported by substantial evidence presents only an issue of law.... It is therefore subject to disposition by summary judgment." (citations

omitted))), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1700, 68 L.Ed.2d 197 (1981).

## IV.  DISCUSSION

### A.  Primary Jurisdiction

■ Delta contends that the district court erred in its referral of the question of the reasonableness of West Coast and Delta's negotiated rates practices to the ICC because the issue was not within the ICC's primary jurisdiction. Delta asserts that this issue is a pure question of law that is within the exclusive jurisdiction of the federal courts. We disagree.

The Supreme Court has explained the concept and purpose of the doctrine of primary jurisdiction as follows:

> The doctrine of primary jurisdiction ... is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.... "Primary jurisdiction" ... applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

*United States v. Western Pac. Ry. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 164–65, 1 L.Ed.2d 126 (1956); *see also Hawaiian Tel. v. P.U.C.*, 827 F.2d 1264, 1272 (9th Cir.1987) (doctrine of primary jurisdiction helps "to prevent substantially inconsistent application of FCC rules and serious judicial encroachment on FCC responsibilities"), *cert. denied*, —— U.S. ——, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988); *United States v. Yellow Freight Sys., Inc.*, 762 F.2d 737, 739–40 (9th Cir.1985) (when an action filed in district court raises issues of industry practice as a matter of transportation policy, this issue should be referred to ICC pursuant to primary jurisdiction doctrine). There are four factors uniformly present when the doctrine is invoked: "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *United States v. General Dynamics Corp.*, 828 F.2d 1356, 1362 (9th Cir.1987) (footnote omitted).

In creating the ICC, "Congress has established an administrative agency that has developed a close understanding of [the often-competing interests reflected in national transportation policy] and that may draw upon its experience to illuminate, for the courts, the play of those interests in a particular case." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 820–21, 93 S.Ct. 2367, 2381–82, 37 L.Ed.2d 350 (1973). A court should ordinarily refrain from expressing a preliminary view on what national transportation policy permits, before the ICC expresses its view. *Id.* at 821, 93 S.Ct. at 2381; *see General Am. Tank Car Corp. v. El Dorado Terminal Co.*, 308 U.S. 422, 428, 60 S.Ct. 325, 329, 84 L.Ed. 361 (1940) (district court ordered to stay its action pending determination by ICC that an allowance to shipper in excess of rental would be unjust, unreasonable and unlawful). The ICC has primary jurisdiction over any question that raises "issues of transportation policy which ought to be considered by the Commission in the interests of a uniform and expert administration of the regulatory scheme laid down by [the Interstate Commerce] Act." *United States v. Western Pac. Ry. Co.*, 352 U.S. at 65, 77 S.Ct. at 166; *see also Great N. Ry. Co. v. Merchants Elevator Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922) (preliminary resort to the ICC in cases testing the reasonableness of carrier practices "is required because the enquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the Commission."). As a result, a complainant in an action in district court raising a question within the primary jurisdiction of the ICC "will nevertheless be required to repair to the Commission for decision of issues...."

*ICC v. Atlantic Coast Line R.R.*, 383 U.S. 576, 579–80, 86 S.Ct. 1000, 1004, 16 L.Ed.2d 109 (1966).

28 U.S.C. § 1336(b) creates statutory authority for the referral by the district court of issues within the ICC's primary jurisdiction. Section 1336(b) provides in pertinent part:

> When a district court or the United States Claims Court refers a question or issue to the Interstate Commerce Commission for determination, the court which referred the question or issue shall have exclusive jurisdiction of a civil action to enforce, enjoin, set aside, annul, or suspend, in whole or in part, any order of the Interstate Commerce Commission arising out of such referral.

28 U.S.C. § 1336(b) (1982). Thus, under this section, after referring an issue to the ICC, the district court has the power to accept or reject the ICC's resolution of the question presented to it in the referral order.

Courts have generally adopted a determination by the ICC that certain conduct constitutes an "unreasonable practice." [1] *See Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 304, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976) (courts defer to agency when case "raises a question of the validity of a rate or practice included in a tariff filed with an agency"); *Carriers Traffic Serv., Inc. v. Anderson, Clayton & Co.*, 881 F.2d 475, 481–83 (7th Cir.1989) (ICC's determination that retroactive application of a "shipper load and count" notation requirement was unreasonable is a matter within its primary jurisdiction); *cf. ICC v. Atlantic Coast Line R.R.*, 383 U.S. at 579–80, 86 S.Ct. at 1003–04 (action filed by shipper in federal court will be referred to the ICC "for decision of issues, like the reasonableness of rates, which call the primary jurisdiction doctrine into play.");

*Pennsylvania R.R. v. United States*, 363 U.S. 202, 205, 80 S.Ct. 1131, 1133, 4 L.Ed.2d 1165 (1960) (ICC's order declaring railroad rates unreasonable forecloses railroad's right to recover those rates).

The Eighth and Eleventh Circuits have recently adopted the ICC's determination that the defense of unreasonable practices in negotiated rates cases may bar recovery of undercharges. In *INF, Ltd. v. Spectro Alloys Corp.*, 881 F.2d 546, 548 (8th Cir. 1989), and *Maislin Indus., Inc. v. Primary Steel, Inc.*, 879 F.2d 400, 403–04 (8th Cir. 1989), the Eighth Circuit ruled that the consideration of unreasonable practices defenses invokes the primary jurisdiction of the ICC. The court reasoned that a case-by-case "[c]onsideration of the facts and circumstances regarding both the existence of the alleged negotiated rate and the reasonableness of allowing [a carrier] to collect the undercharges ... involve the special expertise of the ICC." *Maislin Indus., Inc. v. Primary Steel, Inc.*, 879 F.2d at 403–04. As a result, the Eight Circuit held that district courts should refer the question of the reasonableness of a carrier's attempt to recover undercharges to the ICC.

In *Seaboard System Railroad v. United States*, 794 F.2d 635 (11th Cir.1986), the Eleventh Circuit reviewed an ICC order determining that the collection of undercharges in a negotiated rates case was unreasonable on direct review under 28 U.S.C. § 2321(a). Because "finding a carrier practice unreasonable is the kind of determination that lies in the primary jurisdiction of the Commission," the court affirmed the ICC's application of the "unreasonable practice" provision of 49 U.S.C. § 10701(a). *Seaboard Sys. R.R. v. United States*, 794 F.2d at 638.

---

1. The precise issue of primary jurisdiction in this case is one of first impression in this circuit. We identified but did not reach the issue of whether the ICC has primary jurisdiction to declare rate collection practices unreasonable in *West Coast Truck Lines, Inc. v. Arcata Community Recycling Center, Inc.*, 846 F.2d 1239, 1240 n. 3 (9th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 147, 102 L.Ed.2d 119 (1988). Both the present case and *Arcata,* however, deal with the shift in congressional focus on transportation industry concerns, from strict enforcement of tariff rate filing requirements to objectives of increased competition and regulation reduction by means of price flexibility. *Id.,* at 1245 (citing H.R.Rep. No. 1069, 96th Cong.2d Sess. 3, *reprinted in* 1980 U.S.Code Cong. and Admin. News 2283, 2285).

The Fifth Circuit, on the other hand, has rejected the position that a defense of unreasonableness in an undercharge action should trigger a referral to the ICC. *In re Caravan Refrigerated Cargo, Inc.*, 864 F.2d 388, 393 (5th Cir.1989). In *Caravan*, the court of appeals affirmed a district court's denial of a referral under 28 U.S.C. § 1336(b). The court held that the adoption of a defense to a carrier undercharge action based on the unreasonableness of failing to file negotiated rates does not "raise technical or complex issues, regarding appropriate rates, that require the expert administration of the Commission and thereby invoke the primary jurisdiction doctrine." *Id.* at 389–90.

Delta asserts that *Farley Transportation Co., Inc. v. Santa Fe Trail Transportation Co.*, 778 F.2d 1365 (9th Cir.1985), requires that we join the Fifth Circuit in determining that unreasonable practices defenses do not invoke the ICC's primary jurisdiction. In *Farley Transportation*, an agent from a federal bureau, authorized to ensure compliance with the proper tariffs, was denied access to the shipper's verifying records. *Id.* at 1368. As a result, the agency applied a penalty tariff—equal to ten times the normal shipping charges. The shipper challenged the tariff as applied, but conceded that the tariff was both reasonable and unambiguous on its face. *Id.* at 1370. The only questions for resolution were whether the shipper had refused to disclose the verifying information and whether it had any legal justification for doing so. *Id.* at 1372. Because the shipper did not challenge the reasonableness of the penalty tariff on its face or the underlying cost allocation that went into the making of the tariff, we concluded that the doctrine of primary jurisdiction was inapplicable. *Id.* at 1371.

*Farley* is clearly distinguishable from the matter before this court. The issue referred to the ICC in the matter *sub judice* is within its primary jurisdiction. In reviewing a carrier's practice of negotiating a lower rate, and then attempting to collect an additional amount set forth in the filed rate, the ICC must make a variety of factual findings within its special competence. *Maislin Indus., Inc. v. Primary Steel, Inc.*, 879 F.2d at 403–04. For example, the Commission must determine whether the shipper reasonably relied upon the negotiated figure as being in the same amount as the filed rate and whether the carrier billed and accepted payment of the negotiated rate for numerous shipments, and thereafter demanded additional payment at the filed rate. *See id.* (in assessing unreasonableness of a challenged billing practice, the ICC must consider "the facts and circumstances regarding both the existence of the alleged negotiated rate and the reasonableness of allowing [the carrier] to collect the undercharges.") After making these factual findings, the ICC must determine that this course of conduct is unreasonable in light of its experience with tariff negotiation practices. *See INF, Ltd. v. Spectro Alloys Corp.*, 881 F.2d at 549–50 (the "ultimate statutory issue," the reasonableness of a carrier's billing practices, "involves inherently factual inquiries" within the special competence of the ICC).

We agree with the ICC that a determination whether a practice is unreasonable calls upon the Commission's "expert analysis of current regulatory and competitive conditions in the nation's motor carrier industry." *Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates*, Ex Parte No. MC–177, 5 I.C.C.2d 623 (June 14, 1989) (*Negotiated Rates II*). This matter presented the district court with a question that involves important issues of national transportation policy and appropriate industry practice. We agree with the Eighth and Eleventh Circuits that the determination of unreasonable practices in negotiated rates cases is within the ICC's primary jurisdiction. The district court correctly referred this case to the ICC for its consideration.

B. Review of the ICC's Determinations:

Because the consideration of unreasonable practices defenses invokes the ICC's primary jurisdiction, the district court's review of the ICC's decision in this case was more deferential than the *de novo* standard asserted by Delta. The district court re-

viewed the ICC's policy statements to ensure that they were not contrary to law and the ICC's decision to allow an unreasonable practices defense in this case to ensure that it was supported by substantial evidence.

Under 5 U.S.C. § 706, "[t]o the extent necessary for decision and when presented, the reviewing court shall decide all relevant questions of law [and] interpret constitutional and statutory provisions...." 5 U.S.C. § 706 (1982). Although the judiciary is the final arbiter of issues of statutory construction, "if the statute is silent or ambiguous with respect to the specific issue, the question for the courts is whether the agency's answer is based on a permissible construction of the statute." *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnote omitted). Thus, an administrative agency's interpretation of its own regulations is entitled to substantial deference. *Oregon v. Bureau of Land Management*, 876 F.2d 1419, 1425 (9th Cir.1989); *State of California, Dept. of Educ. v. Bennett*, 833 F.2d 827, 830 (9th Cir.1987); *Marathon Oil Co. v. United States*, 807 F.2d 759, 765 (9th Cir.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987); *Sierra Club v. Clark*, 774 F.2d 1406, 1408 (9th Cir.1985). The court need not conclude that the agency's construction is the only reasonable interpretation of the statute, or that the court would have reached the same conclusion, but only that the agency's interpretation is reasonable and is not contrary to congressional intent. *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. at 843 n. 11, 104 S.Ct. at 1782 n. 11.

Agency findings and conclusions are reviewed under the standard set forth in 5 U.S.C. § 706(2). Section 706(2) provides, in pertinent part, that the reviewing court shall

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

.     .     .     .     .

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

.     .     .     .

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute.

5 U.S.C. § 706(2) (1982). This standard of review is very narrow. *Bowman Transp., Inc. v. Arkansas Best Freight Sys., Inc.*, 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974); *Humphrey v. United States*, 745 F.2d 1166, 1169–70 (8th Cir. 1984).

The district court applied the correct standards of review in its consideration of the ICC's decision. Because our review of the district court's legal conclusions is *de novo*, we now examine the ICC's construction of § 10701(a), as adopted by the district court, to ensure that it is not contrary to congressional intent. We must review the ICC's factual determinations that West Coast and Delta's billing practices were unreasonable to ascertain whether these findings are supported by substantial evidence.

1.   Unreasonable Practices Exception to the Filed Rate Doctrine:

In *Negotiated Rates I* and *Negotiated Rates II*, the ICC declared that it would find the application of filed rates unreasonable when the shipper and the carrier have engaged in "a course of conduct consisting of: (1) negotiating a rate; (2) agreeing to a rate that the shipper reasonably relies upon as being lawfully filed; (3) failing, either willfully or otherwise, to publish the rate; (4) billing and accepting payment at the negotiated rate for (sometimes) numerous shipments; and (5) then demanding additional payment at higher rates." *Negotiated Rates II*, 5 I.C.C.2d 623. Delta contends

that the ICC's decision vitiates the filed rate doctrine.

49 U.S.C. § 10761(a) sets forth the statutory basis for the filed rate doctrine. Section 10761(a) states that "[a] carrier may not charge or receive a different compensation for that transportation or service than the rate specified in the tariff...."[2] This statute reflects a strong congressional policy of encouraging national uniformity of rates and preventing discrimination by carriers in favor of large shippers. *See* S.Rep. No. 46, 49th Cong., 1st Sess., 179–200 (1889) ("The posting or publication of rates, to be preventive of unjust discrimination, must mean that the railroads shall be operated under a system of fixed rates ... and any deviation therefrom should be declared unlawful."); *see also* Dempsey, *Rate Regulation and Antitrust Immunity in Transportation: The Genesis and Evolution of this Endangered Species*, 32 Am.U. L.Rev. 335, 338, 347–48 (1983).

Judicial interpretation and enforcement of § 10761 led to the creation of the filed rate doctrine. The Supreme Court explained the filed rate doctrine in the following words:

> Under the Interstate Commerce Act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict, and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of inter-

state commerce in order to prevent unjust discrimination.

*Louisville & Nashville R.R. v. Maxwell,* 237 U.S. 94, 97, 35 S.Ct. 494, 495, 59 L.Ed. 853 (1915); *see also Southern Pac. Transp. v. Commercial Metals Co.,* 456 U.S. 336, 352, 102 S.Ct. 1815, 1825, 72 L.Ed.2d 114 (1982) (equities of case insufficient to overcome filed rate doctrine; remedies "best left to the ICC"); *Louisville & Nashville R.R. v. Central Iron & Coal Co.,* 265 U.S. 59, 65, 44 S.Ct. 441, 442, 68 L.Ed. 900 (1924) (tariff rate "fixed by law" and not to be reduced); *Boston & M. R.R. v. Hooker,* 233 U.S. 97, 112, 34 S.Ct. 526, 528, 58 L.Ed. 868 (1914) (purpose of Act was "to have but one rate, open to all alike and from which there could be no departure"); *Armour Packing Co. v. U.S.,* 209 U.S. 56, 81, 28 S.Ct. 428, 435, 52 L.Ed. 681 (1908) (if rates "subject to secret alteration by special agreement," antidiscrimination purpose of statute will fail); *New York, N.H. & H. R.R. v. ICC,* 200 U.S. 361, 391, 26 S.Ct. 272, 276, 50 L.Ed. 515 (1906) (purpose of act "to secure equality of rates as to all and to destroy favoritism" through "requiring the publication of tariffs and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences and all other forms of undue discrimination").

As Justice Brandeis noted in *Louisville & Nashville R.R. v. Maxwell,* however, the filed rate doctrine is not an absolute. The filed rate must be applied by the ICC *"unless it is found by the Commission to be unreasonable."* 237 U.S. at 97, 35 S.Ct. at 495 (emphasis added). The Interstate Commerce Act grants the ICC statutory authority to review carriers' tariff practices. 49 U.S.C. § 10701(a).[3] If the Commission de-

---

**2.** Section 10761(a) provides in full text:

> (a) Except as provided in this subtitle, a carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission under chapter 105 of this title shall provide that transportation or service only if the rate for the transportation or service is contained in a tariff that is in effect under this subchapter. That carrier may not charge or receive a different compensation for that transportation or service than

the rate specified in the tariff whether by returning a part of that rate to a person, giving a person a privilege, allowing the use of a facility that affects the value of that transportation or service, or another device. 49 U.S.C. § 10761(a) (1982).

**3.** Section 10701(a) provides:

> A rate (other than a rail rate), classification, rule, or practice related to transportation or service provided by a carrier subject to the jurisdiction of the Interstate Commerce Com-

termines those practices to be unreasonable, it may proscribe them under 49 U.S.C. § 10704(a)(1).[4] Several courts of appeals have approved the ICC's enforcement of the negotiated amount instead of the filed rate because of unreasonable tariff practices engaged in by the carrier. *See INF, Ltd. v. Spectro Alloys Corp.*, 881 F.2d at 548; *Maislin Indus., Inc. v. Primary Steel, Inc.*, 879 F.2d at 405; *Seaboard Sys. R.R. v. United States*, 794 F.2d at 637–38.

■ Delta asserts that the ICC's recent vigorous employment of the reasonable practice provision of section 10701(a) is a departure from its prior practice of strictly interpreting the filed rate doctrine and is an impermissible construction of that statute. To be entitled to deference by this court, the ICC's construction of its regulations must be reasonable in light of prior interpretation and application. *Villa View Community Hosp., Inc. v. Heckler*, 720 F.2d 1086, 1090 (9th Cir.1983) (quoting *Pacific Coast Medical Enters. v. Harris*, 633 F.2d 123, 131 (9th Cir.1980)). "Reasonable" in this context, however, does not mean fixed or inflexible. Our national transportation policy is not static; the ICC may alter its administrative rulings to adapt to changing economic and industry conditions. *American Trucking Ass'ns v. Atchison, Topeka & Santa Fe Ry. Co.*, 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967). In *American Trucking Association*, the Supreme Court reasoned as follows:

> The Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice. *Compare SEC v. Chenery Corp.*, 333 U.S. 194 (1947); *FCC v. WOKO*, 329 U.S. 223 [67 S.Ct. 213, 91 L.Ed. 204] (1946). In fact, although we make no judgment as to the policy aspects of the Commission's action, this kind of flexibility and adaptability to changing needs and patterns of transportation is an essential part of the office of a regulatory agency. Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.

*Id.* at 416, 87 S.Ct. 1618.

When an agency reverses a prior policy or statutory interpretation made by that agency, the conclusion is accorded less deference than is ordinarily extended to agency determinations. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987); *Watt v. Alaska*, 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981). An agency will be required not only to show that its new policy is reasonable, but also to provide a reasonable rationale supporting its departure from prior practice. *See Motor Vehicles Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (overturning an agency reversal because the agency had provided no expla-

---

mission under chapter 105 of this title must be reasonable. A through route established by such a carrier (including a rail carrier) must be reasonable. Divisions of joint rates by those carriers (including rail carriers) must be made without unreasonable discrimination against a participating carrier and must be reasonable.
49 U.S.C. § 10701(a) (1982).

**4.** Section 10704(a)(1) states:
When the Interstate Commerce Commission, after a full hearing, decides that a rate charged or collected by a carrier for transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title, or that a classification, rule, or practice of that carrier, does or will violate this subtitle, the Commission may prescribe the rate (including a maximum or minimum rate, or both), classification, rule, or practice to be followed. The Commission may order the carrier to stop the violation. When a rate, classification, rule, or practice is prescribed under this subsection, the affected carrier may not publish, charge, or collect a different rate and shall adopt the classification and observe the rule or practice prescribed by the Commission.
49 U.S.C. § 10704(a)(1) (1982).

nation for its change in policy); *Mesa Verde Constr. Co. v. Northern Cal. Dist. Council of Laborers*, 861 F.2d 1124, 1130–34 (9th Cir.1988) (en banc) (upholding an agency reversal after finding that the previous policy had been unworkable in practice). However, a reversal of prior policy or statutory interpretation does not wholly vitiate our deference to agency determinations. *NLRB v. International Ass'n of Bridge, Structural and Ornamental Ironworkers*, 434 U.S. 335, 351, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978). "Although the consistency of an agency's interpretation is one relevant factor in judging its reasonableness, an agency's reinterpretation ... is nevertheless entitled to deference, so long as the agency acknowledges and explains the departure from its prior views." *Mobil Oil Co. v. EPA*, 871 F.2d 149, 152 (D.C.Cir.1989).

Here, the ICC has acknowledged its reversal and has provided an adequate rationale for its change in policy. The ICC formulated its *Negotiated Rates I* and *Negotiated Rates II* policy statements in response to a variety of changes in the transportation industry. Increasing competition in the motor carrier industry makes discrimination in favor of large shippers unlikely and impracticable. In the past ten years, because of relaxed entry requirements, the number of regulated motor carriers in the United States has more than doubled—from 17,000 in 1979 to 39,000 in 1988. *Negotiated Rates II*, 5 I.C.C.2d 623. Because these carriers are now allowed to obtain licenses to operate in broad geographic areas and transport a wide array of commodities, carriers face greater price competition for shippers' business. *Id.*

Statutory changes to the Interstate Commerce Act have relaxed regulation in order to increase competition. Under the Motor Common Carrier Act of 1980, Pub.L. No. 96–296, § 10930(a), for example, the same carrier may have both common and contract operating authority. *Negotiated Rates II*, 5 I.C.C.2d 623. Contract carriers do not have to file their rates and are not subject to the antidiscrimination provisions of the Act. *Central & Southern Motor*

*Freight Tariff Ass'n v. United States*, 757 F.2d 301, 325 (D.C.Cir.) (per curiam) (citing 49 U.S.C. §§ 10709(c), 10741(b)), *cert. denied*, 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). The 1980 Act represents a congressional judgment that "it is the policy of the United States Government ... to promote competitive and efficient transportation service [by motor carrier]." 49 U.S.C. § 10101(a)(2) (1982).

These statutory modifications have changed the Commission's focus from regulatory enforcement to a greater reliance on competitive pressures. *Negotiated Rates II*, 5 I.C.C.2d 623. A variety of practices that previously would have been considered discriminatory are now allowed. For example, the ICC has recently ruled that volume discount rates are not per se unlawful and may be justified by cost savings to the carrier. *See Lawfulness of Volume Discount Rates by Motor Common Carrier of Property*, 365 I.C.C. 711, 715–16 (1982). Moreover, carriers may impose geographic or product line restrictions that must be met to obtain rate reductions. *See Rates for Named Shipper or Receiver*, 367 I.C.C. 959, 962–65 (1984).

In addition to increased competitive pressures, statutory changes, and a relaxed regulatory climate, the ICC's *Negotiated Rates* decisions are a practical response to the information costs faced by shippers. The ease of filing tariffs and the sheer number filed no longer makes it appropriate to allocate the burden of discovering a filed rate to the shipper in all cases. Reduced tariff rates may now be filed to become effective on one day's notice. *Short Notice Effectiveness for Independently Filed Rates*, 1 I.C.C.2d 146 (1984), *aff'd sub nom. Southern Motor Carriers Rate Conference v. United States*, 773 F.2d 1561 (11th Cir.1985). As the ICC has noted, in light of the increased volume of tariff filings, "it would be extremely difficult for shippers to determine ... whether the agreed-upon rate is actually on file...." *Negotiated Rates II*, 5 I.C.C.2d 623.

The ICC's determination that the collection of undercharges constitutes an unrea-

sonable practice if the shipper is unaware of the filed rate is also a reflection of changing legislative goals. Congress modified national transportation policy when it amended 49 U.S.C. § 10101(a) in the Motor Carrier Act of 1980. Section 10101(a)(2) now directs the Commission, "in regulating transportation by motor carrier, to promote competitive and efficient transportation services in order to (A) meet the needs of shippers, receivers, passengers, and consumers; [and] (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping and traveling public...." 49 U.S.C. § 10101(a)(1)(A), (B) (1982). In addition, § 10101(a)(1)(D) directs the ICC to encourage the establishment of reasonable transportation rates without "unfair or destructive competitive practices." 49 U.S.C. § 10101(a)(1)(D) (1982). Congress intended these sections of the Motor Carrier Act "to emphasize the importance of competition and efficiency as the most desirable means for achieving transportation goals while, at the same time, providing the Commission with sufficient flexibility to promote the public interest." H.R.Rep. No. 96–1069, 96th Cong., 2d Sess. 12, *reprinted in* 1980 U.S.Code Cong. & Admin. News 2283, 2294.

Section 10701(a) provides the ICC with the mechanism to put into effect Congress' restated goals of national transportation policy. By declaring the adherence to filed rates unreasonable under the circumstances presented in this case, the ICC has demonstrated its intention to prevent carriers from engaging in unfair competitive practices. Under the ICC's decision, a carrier cannot profit from misquoting tariffs to shippers to obtain their business, with the secret intention of recovering the undercharges in court action under the filed rate doctrine. By permitting negotiated rates to be raised as a defense to actions to collect undercharges and placing the burden of filing rates on the carrier, the ICC permits "a variety of quality and price options to meet changing market demands and the diverse demands" of shippers. Finally, by enabling the Commission to review negotiated rates practices on a case-by-case basis, the ICC's interpretation of

§ 10701(a) provides the ICC "with sufficient flexibility to promote the public interest."

As the Eighth Circuit has stated, "[t]he approach taken by the ICC does not abolish the filed rate doctrine, but merely allows the ICC to consider all of the circumstances, including ... defenses, to determine if strict adherence to the filed rate doctrine would constitute an unreasonable practice." *Maislin Indus., Inc. v. Primary Steel, Inc.*, 879 F.2d at 405. We conclude that the Commission's construction of §§ 10701(a) and 10761 is permissible. Because the ICC's policy harmonizes the filed rate doctrine with the statutory proscription of unreasonable practices, we hold that the ICC's consideration of unreasonable practices defenses to undercharge actions is consistent with congressional intent.

2. Application of the Unreasonable Practices Policy:

We must next determine whether the ICC's application of its unreasonable practices policy statement regarding undercharges to the facts of this case was an abuse of discretion, arbitrary and capricious, or unsupported by substantial evidence.

Under the substantial evidence standard, this court will affirm the findings of the ICC if there is enough evidence " 'to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.' " *Illinois Central R.R. v. Norfolk & W. R.R.*, 385 U.S. 57, 66, 87 S.Ct. 255, 260, 17 L.Ed.2d 162 (quoting *Labor Bd. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660 (1939)). This court may not substitute its own conclusions for those fairly drawn by the Commission from the evidence. *Id.* 385 U.S. at 69, 87 S.Ct. at 262.

In its response to the appellee's petition before the ICC, Delta conceded that West Coast had negotiated rates lower than its filed rates with Marine and Weyerhaeuser, that West Coast failed to publish that negotiated rate with the ICC, that West Coast had billed and collected the negotiated rate

from Marine and Weyerhaeuser, and that Delta's suit constituted an attempt to recover the aggregate difference between the negotiated rate and the filed rate. As a result, the sole factual issue before the Commission was whether Marine and Weyerhaeuser had reasonably relied on the negotiated rate as the lawfully applicable tariff.

The verified statements of the two senior employees at Marine and Weyerhaeuser responsible for negotiating rates with a representative of West Coast were presented to ICC regarding this factual question. This evidence revealed that both shippers were offered cheaper rates by other carriers. Weyerhaeuser and Marine would have used other carriers if West Coast had indicated that it would attempt to collect a higher rate than the negotiated price. The shippers had no knowledge that the negotiated rates had not been filed with the ICC. Neither Delta nor West Coast submitted evidence to rebut these verified statements.

The evidence presented to the ICC also showed a course of conduct in which West Coast billed Weyerhaeuser and Marine at the negotiated amount over the course of several years without ever indicating that the tariff rate was higher and that the shippers had been undercharged. As a result, the ICC concluded that West Coast's conduct was intended to induce, and did in fact induce, the appellees reasonably to rely on the negotiated amounts as being the same as the filed rates.

The administrative record contains substantial and unrebutted evidence that fully supports the ICC's findings. The ICC's determination that West Coast and Delta's billing practices were unreasonable is supported by substantial evidence.

## CONCLUSION

In this case, the district court was presented with two questions in its review of the ICC decision: Whether the ICC *Negotiated Rates I* and *Negotiated Rates II* policy statements were contrary to law, and whether the ICC's decision that West Coast had engaged in unreasonable practices was based on substantial evidence.

Both of these questions are questions of law, appropriate for resolution on summary judgment. Because we conclude that the ICC's consideration of unreasonable practices defenses in undercharge actions is not contrary to law, and that the ICC's decision that West Coast and Delta engaged in unreasonable practices is based on substantial evidence, the judgment of the district court is AFFIRMED.